NASH-KELVINATOR CORPORATION and another, Appellants vs. INDUSTRIAL COMMISSION and another, Respondents.

*October 15—November 16, 1948.*

*Alfred E. La France* of Racine, attorney,. and *Horace J. Mellum* of Kenosha of counsel, for the appellants.

For the respondent Industrial Commission there was a brief by the *Attorney General* and *Mortimer Levitan,* assistant attorney general, and oral argument by *Mr. Levitan.*

ROSENBERRY, C. J.   The defendant Neu testified that on or about the 15th day of September, 1945, he was assigned to a position in the drop-forge department of the Nash-Kelvinator Corporation.   The new job consisted of. air-hammer drawing of a spindle, which spindle was to be used on a drive knuckle on the Nash automobile.   The piece of metal that was used to make each spindle weighed approximately four or five pounds.   Each piece was about two and one-half inches square and about seven inches in length.   By dropping the air hammer on the end of each heated piece of metal that end would be drawn down so that it would have a diameter of about one-half inch.   The other end would be drawn down so it would have a diameter something in excess of one inch.   Neu would pick up each piece of heated metal with tongs thirty-two inches in length.   The tongs were held

with his right hand forward and the left hand gripping solidly near the end. When the hammer came down the steel kicked back, transmitting the jar through the tongs to his left arm and shoulder. This happened about seventy-five times a day. After the first or second day of operation he had a severe pain in his left arm and shoulder, and on the second day he went to the hospital because his left hand was swollen and his left arm was painful. In October he noticed a loss of motion in the arm. He continued work until about the first of November, 1945. He was found to be suffering from atrophy of the deltoid muscle due to a nerve injury. He had had no difficulty with the arm or shoulder prior to the spindle job. The defendant Neu filed an application for adjustment of his claim under the Workmen's Compensation Act with the Industrial Commission on April 13, 1946. The last day of his employment was about November 24, 1945. About the latter part of November, 1945, the claimant filed a claim for benefits with the Michigan Life Insurance Company with which he held a policy, and was paid indemnity at the rate of $15 a week until January 6, 1946.

The claimant stated the reason he made no report to his employer before the 17th day of December, 1945, was, (1) because he did not believe it was going to develop into anything serious; (2) because he had had swollen and aching hands before while working in the drop-forge department, which condition cleared up and left him in a short period of time; (3) because he did not believe that the final result would be what it is; (4) because five men in the drop-forge department were depending upon his output of work, and (5) because the plant doctor did not get down to the plant hospital until about ten o'clock in the morning, although he knew that he could have made an appointment with the doctor if he had endeavored to do so.

After the hearing the examiner made and filed findings of fact as follows:

"That the applicant sustained injury caused by disease arising out of his said employment by the respondent; that his last day of work preceding disability resulting from said injury was on or about November 24, 1945, which is, therefore, the date of injury; that at the time of the injury he was performing service growing out of and incidental to his said employment; that the injury was not intentionally self-inflicted; that he sustained no temporary disability causing wage loss; that as a result of the injury, however, he has sustained a permanent disability of forty-six per cent as compared with loss of the left arm at the shoulder; that he has a probable tear of the biceps of the left arm which, however, is likely the result of a fall and further injury sustained on November 24, 1945, and is not compensable. The findings of permanent disability contain nothing attributable to the probable tear of the biceps."

Compensation was awarded amounting to $4,687.90 in all. The examiner appended to the award the following note:

"Note: While the medical witnesses, speaking primarily from the standpoint of their own fields, and without full knowledge of the findings of others, were inclined to not state the cause of the applicant's shoulder disability with definiteness, upon consideration of all the evidence in combination, both lay and medical, it is the opinion of the examiner that the record established the cause by the occupation to a probability and beyond the field of speculation."

The matter was brought on for review before the commission and the commission affirmed the findings and order of the examiner on November 21, 1946.

On this appeal it is the contention of the appellants that there is no credible evidence to sustain the finding of the commission which it is alleged is in the realm of speculation. Three physicians testified on behalf of the appellants. Dr. Lutz testified that on November 25, 1945, he reduced a dislocation of the left shoulder under anesthesia. That when he first examined the claimant he observed a definite atrophy of the muscles of the left shoulder; that in his opinion this

atrophy was of long standing and could not have developed from the sidewalk fall. The doctor was asked the following question, and gave the following answer:

"Q. But from what he told you do you have an opinion as to the cause of the atrophy in the muscles of the left shoulder? A. I would say it was possible that the atrophy was due to the occupation."

He then stated that it was within the realm of speculation and conjecture to medically determine the cause of claimant's condition. Dr. Lutz further testified as follows:

"Q. As I understand your testimony, it would be within the realm of possibilities as to what might be the cause of the difficulty that he now has in the shoulder? A. That is correct.

"Q. You wouldn't want to take it out of the realm of speculation and place it in the realm of reasonable probability, would you? A. No, because again I feel that is an orthopedic question, to be answered by an orthopedic surgeon. I can only say definitely that I am convinced that the atrophy was not due to the dislocation."

Dr. Schumm testified as follows:

"Q. Doctor, do you not think that repeated kickbacks on that left shoulder might cause a condition which results in atrophy of that muscle? A. No, I don't think so.

"Q. You don't think that is possible? A. Oh, it is possible. Anything is possible. I don't think it is probable as a result of my experience in seeing great numbers of cases that have had kickbacks.

"Q. Have you ever had cases of injury to the muscle that resulted in atrophy to the muscle—fellows using these air hammers, for instance? A. No.

"Q. Or working in a drop forge? A. No.

"Q. Or repeated shocks to a muscle? A. No."

The doctor was asked the following question:

"Q. You believe it is pure speculation to try to figure out? A. Pure speculation. If I had seen him and examined him

last summer, and seen this thing come on, you could tell something; but the rest is just guess work."

Dr. Herbert W. Powers was appointed an independent medical examiner by the Industrial Commission as a specialist in the field of neurology and reported the result of his examination to the Industrial Commission on June 29, 1946. His report was as follows:

"My examination does not permit me to say definitely the cause of nonfunction of the axillary nerve. It would, in my opinion, be possible for a series of jarring concussions to set up a neuritis as the result of trauma, the nerve is frequently injured in dislocations, overstretching of the nerves of the brachial plexus being caused by the unusual freedom of movement at the shoulder joint may also occur. Also nerves are subject to inflammatory processes as the result of infections elsewhere in the body. I could not establish any of these possible causes as being the active cause."

Dr. Powers on cross-examination stated that the condition of the applicant was not due to a stroke which he had in 1930 or 1931, and was not due to the fall which led to the dislocation of the left shoulder in 1945. He also testified that the condition might be the result of infection but he found no evidence of infection. Dr. Powers was asked the following questions and gave the following answers:

"Q. Now Doctor, you do say that the series of jars may cause an injury to the nerve? A. Yes.

"Q. Would that be a gradual process? A. Apparently so. In all the cases I have seen, the injuries have been not to the nerve which supplies the muscle so much, as to the sympathetic nerves which have to do with the circulation.

"Q. Doctor, eliminating the fall or other possible cause, might it be due to this nerve condition that exists now or at the time you made your examination? A. Well, I think it would be possible for its being directly due to the injury."

It is evident that by "the injury" the doctor meant the result of the continual jarring resulting from his work. Dr.

Powers also stated that if he eliminated the infection and the fall as causes he would conclude that the condition was due "*A.* To an injury which he received in the process of his employment." In addition to the medical testimony there was also lay testimony regarding the applicant's injuries.

It has been held in a number of cases that the commission is not bound by the medical testimony but may consider facts testified to by lay witnesses. *Milwaukee Western Fuel Co. v. Industrial Comm.* 245 Wis. 334, 13 N. W. (2d) 919; *Pawling & Harnischfeger Co. v. Mildenberger,* 170 Wis. 146, 174 N. W. 455; *Kiesow v. Industrial Comm.* 214 Wis. 285, 252 N. W. 604; *Biever v. Szultek, ante,* p. 134, 33 N. W. (2d) 246.

The work at a drop forge in which the claimant was engaged prior to the spindle job had resulted in no disability. In regard to the kickback the claimant testified:

"It would throw me back. A lot of times it would give me such an awful jerk it would keep throwing me back. I would place it there again and would come again."

When asked what effect it would have on his shoulder he replied: "It created jars into my shoulder and into my left arm." Neu did several thousand of the spindles. When asked what proportion kicked back on him he replied:

"Well, the job is a job that—it just kicks back all the time. The die—the way the die was cut out, I don't think it could help but kick back. The hotter they were the harder they kicked."

There was other testimony to the same effect by other witnesses. It appeared that the effect of the continuing kickback which finally resulted in the injury for which compensation is sought was present on the first day of·his employment. He testified:

"I had a tremendous pain in my arm and shoulder and back of my neck on the first day."

He went to the hospital on the second day because his hand was swollen and his left arm pained him. Around the 20th of October he noticed loss of motion. The pain was continuous. There is in the record no testimony which indicates that the condition from which it is undisputed that claimant was suffering, was due to infection. It also appears conclusively that the injury was not due to the fall.

It is considered that upon the whole record there is sufficient substantial evidence to sustain the finding of the commission. It is not claimed that the fall which resulted in the plaintiff's dislocation was due to the claimant's injuries or that the fall caused the atrophy of the muscles of the shoulder. That is eliminated by all of the testimony. The atrophy preceded the fall. The medical witnesses might well say that from a medical standpoint it was impossible to determine whether the atrophy was due to the employment because they had no way of eliminating the possibility of infection. That there was no previous infection is established by the testimony of the plaintiff, supported by other evidence.

*By the Court.*—Judgment affirmed.

BROADFOOT, J., took no part.